IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| KP ENGINEERING, LP, *et al.*, | § | Case No. 19-34698 (DRJ) |
| | § | |
| | § | (Joint Administration Requested) |
| Debtors.[1] | § | (Emergency Hearing Requested) |
| | § | |

**DECLARATION OF KYLE MCCOY, EXECUTIVE VICE PRESIDENT AND
CHIEF FINANCIAL OFFICER OF DEBTOR KP ENGINEERING, LP,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Kyle McCoy, hereby declare under penalty of perjury:

1. I am the Executive Vice President and Chief Financial Officer of Debtor KP Engineering, LP, which is an affiliate of KP Engineering, LLC, its general partner, together, the above-captioned debtors and debtors in possession (collectively, "**KPE**" or the "**Debtors**").

2. I have been associated with KPE since October 2017, and I am generally familiar with the day-to-day operations, business and financial affairs, and books and records. In my capacity as Executive Vice President and CFO, I oversee and manage the Debtors' financial operations, and I am responsible for the Debtors' reporting, budgeting and strategic planning.

3. I hold a Bachelor's Degree in Business Administration and a Masters of Professional Accounting from the University of Texas at Austin and I am a Certified Public Accountant licensed in the State of Texas.

4. Concurrently with the filing of this declaration (the "**Declaration**") on the date hereof (the "**Petition Date**"), each of the Debtors has filed in this Court (the "**Bankruptcy**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: KP Engineering, LP (7785) and KP Engineering, LLC (0294). The location of the Debtors' corporate headquarters and the Debtors' service address is: 5555 Old Jacksonville Highway, Tyler, TX 75703.

**Court**") a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "**Bankruptcy Code**"). I submit this Declaration to assist the Bankruptcy Court and parties in interest in understanding the circumstances that compelled the filing of these bankruptcy cases (the "**Chapter 11 Cases**") and in support of (i) the petitions for relief under Chapter 11 of the Bankruptcy Code, and (ii) the emergency relief that the Debtors have requested from the Bankruptcy Court pursuant to the motions and applications described herein (collectively, the "**First Day Motions**").

5. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and advisors (including legal counsel), my review of relevant documents and information concerning the Debtors' operations, financial affairs, books and records, and restructuring process, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors.

6. Part I provides an overview of the Debtors' business and organizational structure. Part II provides an overview of the Debtors' prepetition capital structure and indebtedness. Part III provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases. Part IV summarizes the First Day Motions and the bases for the relief sought therein.

**I.      The Debtors' Business and Organizational Structure**

      **A.      The Debtors' Business**

7. The Debtors are primarily engaged in the business of designing and executing customized engineering, procurement, and construction ("**EPC**") projects for the refining, midstream, and chemical industries. As an EPC contractor, KPE generally enters into agreements with owners pursuant to which KPE LP will design a facility, procure the needed

079610.0000022 EMF_US 75520841v11

equipment and materials, and supervise construction of the facility. KPE LP typically retains subcontractors to perform construction pursuant to agreements and/or purchase orders between KPE LP and the subcontractors. The Debtors offer services in three phases:

- **Process Studies**: In early project phases for EPC contracts, projects require available alternatives to be considered and evaluated efficiently and accurately. KPE Conducts process studies to evaluate available alternatives and ensure effective solutions.

- **Project Development**: After KPE evaluates process alternatives and obtains endorsement of the recommended solution by the customer, KPE works to develop the scope of the project and detail the related performance, capital and operating requirements to provide the customer with a clear understanding of projected costs.

- **Project Execution**: Once the scope of the project and projected costs has been accepted by the customer, KPE executes the agreed upon project solution.

8. The Debtors generate nearly all of their revenue from EPC contracts. All of the EPC contracts and other business functions and operations are managed by KPE LP. The sole business function of KPE LLC is to serve as the general partner of KPE LP.

B. **The Debtors' Organizational Structure**

9. KP Engineering, LLC ("**KPE LLC**"), a Delaware limited liability company, is the general partner of KP Engineering, LP ("**KPE LP**"), a Texas limited partnership. KPE LLC was formerly known as Koch Partners, LLC and was organized on or about November 10, 2003. On February 18, 2004, Koch Partners, LLC, as general partner, and Ryno Engineering, LLC and Koch Chemical Technology Group, Inc., as limited partners, formed Koch Partners, LP. Effective April 29, 2008, Koch Partners, LLC changed its name to KP Engineering, LLC. Effective May 5, 2008, Koch Partners, LP changed its name to KP Engineering, LP.

10. As of the Petition Date, KPE LLC remains the general partner of KPE LP, and BTS Enterprises, Inc. ("**BTS**") is the sole limited partner of KPE LP. KPE LLC owns 1% of KPE LP and BTS owns the remaining 99% of KPE LP. BTS owns 100% of KPE LLC.

3

## II. The Debtors' Prepetition Capital Structure

### A. The Prepetition Secured Credit Facility

11. In or around May 11, 2017, Debtor KPE LP executed that certain Promissory Note in the original principal amount of $12,000,000.00 (the "**Revolving Note**") along with that certain Credit Agreement (the "**Revolving Credit Agreement**") and that certain Cash Collateral Agreement (the "**Revolving Cash Collateral Agreement**" and together with all other documents, instruments, and agreements delivered in connection with the foregoing agreements, the "**Revolving Loan Documents**") between Debtor KPE LP, as borrower, and Texas Capital Bank, NA, as lender (the "**Prepetition Lender**").

12. In or around May 15, 2017, Debtor KPE LP executed that certain Promissory Note in the original principal amount of $16,000,000.00 (the "**2017 Note**") along with that certain Credit Agreement (the "**2017 Credit Agreement**") and that certain Security Agreement (the "**2017 Security Agreement**" and together with all other documents, instruments, and agreements delivered in connection with the foregoing agreements, the "**2017 Loan Documents**") between Debtor KPE LP, as borrower, and the Prepetition Lender, as lender. The Prepetition Note, and related prepetition obligations, was secured by a valid and enforceable lien encumbering substantially all assets of Debtor KPE LP, as set forth in the Prepetition Loan Documents (the "**2017 Collateral**"). The 2017 Note bears interest at LIBOR plus 3.5%, or 5.06%, and is payable in monthly installments of $266,667 (plus variable interest calculated monthly) with the final installment due May 14, 2022. Debtor KPE LLC was also party to the 2017 Pledge Agreement. Mr. Steele, individually, guaranteed the 2017 Note.

13. In or around June 8, 2018, Debtor KPE LP executed that certain Loan Modification Agreement and that certain Promissory Note in the original principal amount of $25,000,000.00 (the "**2018 Note**") along with that certain Credit Agreement (the "**2018 Credit**

4

**Agreement**") and that certain Security Agreement (the "**2018 Security Agreement**" and together with all other documents, instruments, and agreements delivered in connection with the foregoing agreements, the "**2018 Loan Documents**" and together with the 2017 Loan Documents, the "**Prepetition Loan Documents**") between Debtor KPE LP, as borrower, and the Prepetition Lender, as lender. The Prepetition Note, and related prepetition obligations, was secured by a valid and enforceable lien encumbering substantially all assets of Debtor KPE LP, as set forth in the Prepetition Loan Documents (the "**2018 Collateral**"). The 2018 Note paid and replaced the 2017 Note and terminated the Revolving Loan Documents.

14. Prior to the Petition Date, Brandon T. Steele ("**Mr. Steele**"), individually, owed Debtor KPE LP the sum of $13,169,773.12 (the "**Partner Receivable**") in connection with certain prepetition transactions between Mr. Steele and the Debtors. Immediately prior to the Petition Date, Mr. Steele repaid the Partner Receivable, the proceeds of which were paid by the Debtors to the Prepetition Lender. Thus, on the Petition Date, the outstanding balance under the Prepetition Loan Documents is $8,743,207.21.

### B.  The Intercompany Transactions

15. In the ordinary course of the Debtors' operations, the Debtors receive certain services from, and make payments for such services to, certain non-debtor affiliates.

16. Specifically, the Debtors lease office space in two facilities owned by non-debtor affiliates KPE Realty, LLC ("**KPE Realty**") and KPE Realty II, LLC ("**KPE Realty II**"). These facilities are located in Tyler, Texas. The Debtors pay monthly base rent to KPE Realty in the amount of $41,666.67 and to KPE Realty II in the amount of $52,083.33. The base rent does not

include payment of utilities for these facilities. The Debtors maintain accounts with certain utility service providers and pay the utility services providers directly for such utilities.[2]

17. The Debtors also sub-lease certain office space in a facility in Tulsa, Oklahoma from non-debtor affiliate Steele Resources, LLC ("**Steele Resources**").[3] The Debtors pay Steele Resources approximately $9,222.46 per month in base rent for the sub-leased space. This base rent factors in payment of certain shared utilities, paid by Steele Resources to the utility service provider, including electricity, gas, and waste removal. The Debtors pay additional utilities for this facility, including phone and internet, directly to the respective utility service provider.[4]

18. In addition to the lease obligations paid to certain non-debtor affiliates described above, KPE makes monthly payments to Steele Resources in the amount of $300,000.00 for certain shared services. These services include accounting, legal, and executive management.

### III. Circumstances Leading to the Commencement of these Chapter 11 Cases

#### A. Challenges Facing the Debtors' Business

19. The Debtors face a number of risks to their business. The landscape surrounding the EPC contractor market is competitive, highly technical, and fast-changing. The Debtors face risks related to a changing environment in which technological advancement is altering their core business. An inability to innovate could be detrimental to the future of the Debtors. However, the Debtors' present innovation has been the cornerstone of its success to date.

---

[2] These payments, and other Utility Services payments, are the subject of the Utilities Motion.

[3] The Debtors also sub-lease certain office space in a facility in Houston, Texas, but such space is leased from a non-debtor non-affiliate named Kvaerner Americas Holding, Inc. ("**Kvaerner**"). The Debtors pay Kvaerner approximately $25,000.00 per month in base rent for the sub-leased space. In addition to the base rent KPE pays to Kvaerner for the sub-leased space, Kvaerner bills KPE for its ratable portion of certain shared utility services, including electricity, gas, and waste removal, as well as other office costs. The Debtors pay additional utilities for this facility, including phone, internet, backup internet, cable, and satellite, directly to the respective utility service provider, which payments, and other Utility Services payments, are also the subject of the Utilities Motion.

[4] These payments, and other Utility Services payments, are also the subject of the Utilities Motion.

### B. The Targa Projects and Related Litigation

20. Effective January 17, 2017, KPE LP and Targa Pipeline Mid-Continent WestTex LLC ("**Targa**"),[5] entered into an Agreement for Engineering, Procurement and Construction (the "**Joyce EPC Agreement**") pursuant to which KPE LP designed, procured equipment, and constructed a 200 million cubic feet per day gas cryogenic processing plant (the "**Joyce Plant**") in Upton County, Texas. The Joyce Plant was completed and is fully operational. All subcontractors and suppliers utilized during the construction of the Joyce Plant have been paid. Despite the completion of the Joyce Plant, KPE LP sustained a significant economic loss.

21. Effective August 3, 2017, KPE LP and Targa entered into an Agreement for Engineering, Procurement and Construction (the "**Johnson EPC Agreement**") pursuant to which KPE LP agreed to design, procure equipment, and construct a 200 million cubic feet per day gas cryogenic processing plant (the "**Johnson Plant**") in Midland County, Texas. However, when the Johnson Plant was near completion, Targa stopped making payments to KPE LP under the Johnson EPC Agreement. As a result of such nonpayment, KPE LP was unable to pay its subcontractors and suppliers for the Johnson Project. Targa also implemented certain change orders that impacted the design, completion timeline and cost of the Johnson Project, after which KPE LP engaged in discussions with Targa regarding Targa's nonpayment. On August 3, 2019, Targa terminated the Johnson EPC Agreement and removed KPE LP from the job site. Targa asserted that its termination was due to KPE LP's failure to pay subcontractors and suppliers.

22. On or around August 24, 2018, Hancock Mechanical, LLC d/b/a Hancock Mechanical Welding & Fabrication ("**Hancock**") filed a lawsuit against KPE LP in the State District Court in Midland County, seeking over $2,500,000.00 in damages in relation to the

---

[5] Targa is a subsidiary of Targa Resources Corp.

Johnson Project (the "**Johnson Litigation**"). In addition, a significant number of the subcontractors who supplied services and supplies for the Johnson Plant have filed claims against KPE LP (collectively, the "**Subcontractor Claims**") in the Johnson Litigation or as other standalone lawsuits. On June 10, 2019, Targa filed cross claims in the Johnson Litigation against KPE for "monetary relief over $1,000,000." KPE LP lacks the financial resources to continue funding the Johnson Litigation, defend the Subcontractor Claims, and to satisfy the resulting judgments, if any. The Johnson Litigation and Subcontractor Claims have created financial strain for the ongoing business operations of KPE and have distracted KPE personnel from day-to-day operations, making it difficult for KPE to continue to perform under its EPC contracts.

### C.     DIP Financing and Cash Collateral

23.     Contemporaneously herewith, with the First Day Motions, the Debtors have filed a motion (the "**DIP Motion**") seeking, among other things, interim and final approval from the Bankruptcy Court of definitive documentation for the DIP Facility on the terms and conditions set forth in the DIP Note (as defined in the DIP Motion, a copy of which is attached to the DIP Motion as Exhibit A to the proposed Interim Order), which, if approved by the Bankruptcy Court as proposed, would contain the following terms, among others:

- a superpriority and priming debtor-in-possession revolving credit facility in an amount of up to $4 million, subject to availability under the Debtors' borrowing base thereunder, provided by BTS (the "**DIP Lender**"), with $750,000.00 of such DIP Facility available to the Debtors upon entry of the Interim Order and the remaining $3,250,000.00 of such DIP Facility available to the Debtors upon entry of the Final Order (in each case subject to the terms of the DIP Facility and DIP Orders);

- the maturity date of the DIP Facility will be the earlier of: (i) the date a confirmed plan of reorganization becomes effective or (ii) August 15, 2020;

- interest will accrue at the Note Rate;[6]

- the obligations and liabilities under the DIP Facility will be secured by a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, substantially all assets and property of the Debtors' estates and will be guaranteed by each of the Debtors (the "**DIP Lien**"); which DIP Lien will be deemed assigned to the Prepetition Lender upon entry of the Interim Order; and

- the Interim Order provides that the DIP Lien will prime the Prepetition Liens at the consent of the Prepetition Lender.

The Debtors anticipate closing the DIP Facility promptly following approval by the Bankruptcy Court of the DIP Motion and entry of the Interim Order.

### IV. Relief Sought in the Debtor's First Day Motions

24. Contemporaneously herewith, the Debtors filed numerous First Day Motions seeking orders granting various forms of relief intended to provide stability and to facilitate the Debtors' continued operations and the efficient administration of these Chapter 11 Cases.

25. The Debtors seek by the First Day Motions to, among other things, (i) ensure the continuation of their business operations and cash management system without interruption, (ii) preserve the Debtors' workforce and related programs, and (iii) provide the Debtors with access to liquidity critical to the Debtors' successful reorganization and emergence from bankruptcy. I am familiar with the contents of each of the First Day Motions, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Motions. In my opinion, approval of the relief

---

[6] The Note Rate is the rate equal to the lesser of (a) the Maximum Rate or (b) the Applicable Rate. The Maximum Rate means, at all times, the maximum rate of interest which may be charged, contracted for, taken, received or reserved by Lender in accordance with applicable Texas law (or applicable United States federal law to the extent that such law permits Lender to charge, contract for, receive or reserve a greater amount of interest than under Texas law). The Maximum Rate shall be calculated in a manner that takes into account any and all fees, payments, and other charges in respect of the Loan Documents that constitute interest under applicable law. Each change in any interest rate provided for herein based upon the Maximum Rate resulting from a change in the Maximum Rate shall take effect without notice to Borrower at the time of such change in the Maximum Rate. The Applicable Rate means the Base Rate plus the "Applicable Margin." The Base Rate means for any day, a rate of interest equal to the highest of: (a) the Prime Rate for such day; (b) the sum of the Federal Funds Rate for such day plus ½ of one percent (0.5%); and (c) LIBOR for such day. The Applicable Margin means 2.00% per annum.

9

sought in the First Day Motions will be critical to the Debtors' efforts to reorganize through these Chapter 11 Cases efficiently and with minimized disruptions to their business operations, thereby permitting the Debtors to preserve and maximize value for the benefit of all of their stakeholders and successfully emerge from Chapter 11 more competitively-positioned.

26. The First Day Motions include:

I. Administrative Motions

　A. *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Administration Motion**") [Docket No. 2]

　B. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors, (II) Authorizing Redaction of Certain Personal Identifying Information, and (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information* (the "**Consolidated Creditor Matrix and Top 30 List Motion**") [Docket No. 4]

　C. *Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Omni Management Group, Inc. as Claims and Noticing Agent* (the "**Omni Retention Application**") [Docket No. 5]

II. Operational Motions

　A. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Expense Reimbursements, Benefits, and Related Obligations, (II) Confirming Right to Continue Workforce Programs on a Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Confirming the Debtors' Authority to Transmit Payroll Deductions, and (V) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* (the "**Employee Wages Motion**") [Docket No. 6]

　B. *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests* (the "**Utilities Motion**") [Docket No. 7]

　C. *Debtors' Emergency Motion for Entry of an Order Authorizing the (I) Payment of Prepetition Insurance Obligations, (II) Maintenance of*

10

*Postpetition Insurance Coverage, and (III) Maintenance of Postpetition Financing of Insurance Premiums* (the "**Insurance Motion**") [Docket No. 8]

D. *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Continue to (I) Operate Their Cash Management System, (II) Use Existing Checks and Business Forms and (III) Maintain Existing Bank Accounts; and for Related Relief* (the "**Cash Management Motion**") [Docket No. 9]

E. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Financing on a Secured, Superpriority Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**DIP Motion**") [Docket No. 10]

27. I have read and understand each of the First Day Motions and the relief requested therein. Based on my review, and to the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference. I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, its creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. A description of the relief requested and the facts supporting each of the First Day Motions is attached hereto as Exhibit A. Accordingly, for the reasons set forth herein and in each First Day Motion, the Bankruptcy Court should grant the relief requested in the First Day Motions.

[*The remainder of this page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 23, 2019
Tyler, Texas

/s/ Kyle McCoy
Kyle McCoy,
Executive Vice President and Chief Financial Officer of KP Engineering, LP