## **Exhibit A**

Evidentiary Support for First Day Motions

079610.0000022 EMF_US 75520841v11

# EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

## I. Administrative Motions

A. *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Administration Motion**") [Docket No. 2]

1. Through the Joint Administration Motion, the Debtors seek joint administration of their two chapter 11 cases for procedural purposes only. Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect both Debtors. Thus, I believe that the joint administration of these cases will avoid unnecessary duplication of motions, applications, orders, and other pleadings, thereby resulting in savings for the Debtors' estates.

B. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors, (II) Authorizing Redaction of Certain Personal Identifying Information, and (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information* (the **Consolidated Creditor Matrix and Top 30 List Motion**") [Docket No. 4]

2. Through the Consolidated Creditor Matrix and Top 30 Motion, the Debtors seek authority from the Court to file a consolidated creditor matrix for these Chapter 11 Cases as well as to file a list of the 30 largest unsecured creditors on a consolidated basis. The Debtors also seek authority to redact certain personal identifying information of their employees from the creditor matrix and other filings in these Chapter 11 Cases. The consolidation of the creditor matrix and list of unsecured creditors will avoid unnecessary duplication of service of papers in these Chapter 11 Cases and reduce the cost to the Debtors' bankruptcy estates. Thus, I believe that that the relief requested is in the best interest of the Debtors' estates.

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the First Day Motions.

  C. *Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions as Claims and Noticing Agent* (the "**Omni Retention Application**") [Docket No. 5]

  3. Pursuant to the Omni Retention Application, the Debtors seek entry of an order appointing Omni Agent Solutions ("**Omni**") as claims and noticing agent in these Chapter 11 Cases subject to the terms of the Engagement Agreement attached to the Omni Retention Application. I believe that Omni is well-qualified to perform the services contemplated by the Omni Retention Application, that the services to be performed by Omni are necessary for the successful administration of these Chapter 11 Cases, and that Omni will coordinate their services with the Debtors' other professional to avoid duplication of efforts and expense.

## II. Operational Motions

  A. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Expense Reimbursements, Benefits, and Related Obligations, (II) Confirming Right to Continue Workforce Programs on a Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Confirming the Debtors' Authority to Transmit Payroll Deductions, and (V) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* (the "**Employee Wages Motion**") [Docket No. 6]

  4. Through the Employee Wages Motion, the Debtors seek entry of an order (i) authorizing payment of certain prepetition workforce obligations, including compensation and benefits; (ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business, the workforce related plans, programs, and policies in effect immediately prior to the filing of these Chapter 11 Cases; (iii) authorizing the Debtors to pay any and all, local, state, and federal withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors right to continue to deduct and to transmit deductions from payroll checks as authorized by employees, as required under any workforce-related plan, program, or policy, or as required by applicable law; (v) authorizing all banks to receive, process, honor, and pay all of

the Debtors' prepetition checks and fund transfers on account of an obligations authorized to be paid pursuant to the Employee Wages Motion; and (vi) granting related relief.

5. The Debtors estimate that the aggregate amount of prepetition obligations they seek authority to pay under the Employee Wages Motion is approximately $375,700.00:

| Relief Sought | Amount Requested |
|---|---:|
| Prepetition Workforce Compensation [Section I] | $161,800.00 |
| Employee Reimbursement Obligations [Section II] | $6,100.00 |
| Employee Benefits Obligations [Section III] | $207,800.00[2] |

  a. **Prepetition Workforce Compensation**

6. In connection with the Debtors' operations, the Debtors currently employ 57 Employees, comprised of 30 Employees paid a fixed salary ("**Salaried Employees**") and 27 Employees paid on an hourly basis (the "**Hourly Employees**"). Included in the Employee headcount are 57 full time Employees (the "**Full Time Employees**")[3] and no part time Employees (the "**Part Time Employees**"). Each of the Employees is employed by Debtor KP Engineering, LP. The Debtors' Employees are primarily located at the Debtors' offices in Tyler, Texas, and approximately seven of the Debtors' Employees are located at offices in Houston, Texas. In addition to the Employees, the Debtors' currently also utilize two independent contractors.

---

[2] Of this amount, approximately $128,000.00 is attributable to the Retirement Savings Plans. As discussed in greater detail below, the Debtors are required to fund approximately $15,000.00 of this amount by September 30, 2019 and $45,000.00 of this amount by December 31, 2019 on account of matching contributions under the Retirement Savings Plans. The Debtors are required to fund the remaining approximately $68,000.00 by March 31, 2020.

[3] For purposes of this Motion, Employees who work 30 or more hours per week are considered Full Time Employees, as such Employees are eligible to receive Employee Benefits (as defined below).

7. All of the Debtors' Employees are paid by Debtor KP Engineering, LP. The Debtors pay both Salaried Employees and Hourly Employees on a bi-weekly basis on every other Friday (or, if such Friday is a holiday, then on the immediately preceding business day). The Debtors' average payroll each two-week pay period is approximately $350,000.00. In the ordinary course of business, the Debtors' Salaried Employees are paid one week in arrears, and each pay period ends on the Sunday prior to the applicable pay date. In the ordinary course of business, the Debtors' Hourly Employees are paid one week in arrears, and each pay period ends on the Sunday prior to the applicable pay date. The last date all Employees were compensated prior to the Petition Date was August 22, 2019, which primarily included all wages earned through August 18, 2019.

8. In the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees (collectively, the "**Deductions**"). Deductions are made for amounts related to local, state, and federal income taxes, Social Security and Medicare taxes, child support and other court-ordered garnishments, as well as for savings programs, insurance premiums and other similar benefit programs. The Deductions made by the Debtors each two-week period average approximately $95,000.00.

9. The Debtors estimate that, as of the Petition Date, accrued but unpaid wages owed to the Employees total approximately $99,000.00. The Debtors estimate that, as of the Petition Date, accrued Deductions total approximately $52,000.00.

10. In addition to the Debtors' Employees, the Debtors utilize independent contractors (the "**Independent Contractors**") in the ordinary course of business. Although the Debtors historically utilized a number of independent contractors, as of the Petition Date, the Debtors utilize only two Independent Contractors. The Debtors contract with two separate companies that supply the Independent Contractors: Business Solutions Management, Inc.

("**BSM**") and Genesis Technical Staffing, Inc. ("**Genesis**"). The Debtors make payments directly to BSM and Genesis, generally on a weekly basis. During the six months prior to the Petition Date, the Debtors averaged approximately $170,000.00 per month in payments on account of Independent Contractors. As of the Petition Date, the Debtors are delinquent on their weekly payments to BSM and Genesis, and the Debtors estimate that the aggregate amount owing to BSM and Genesis for services performed by the Independent Contractors prior to the Petition Date is approximately $234,000.00.[4] At this time, the Debtors are not seeking authority to make any payments to BSM or Genesis for services performed by the Independent Contractors prior to the Petition Date. The Debtors reserve the right to seek authority to make such payments at a later date.

        11. As part of their overall compensation, Full Time Employees are eligible, in certain circumstances, to receive paid time off ("**PTO**") for, among other things, vacation, personal days, and holidays. The Debtors' PTO programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during these Chapter 11 Cases. The specifics of the Debtors' PTO policies vary based upon length of employment and scheduled work hours per week. Annual vacation hours that may be accrued by the Debtors' Full Time Employees range from 0 hours to 200 hours, and a Full Time Employee's unused PTO hours may be carried over to the following year, up to a maximum amount of 40 hours. The Debtors seek authority to pay $10,800.00 pursuant to this Motion on account of two employees who are voluntarily terminating their employment with the Debtors effective August 23, 2019.

---

[4] Of this amount, approximately $42,000.00 is owing to BSM and $192,000.00 is owing to Genesis.

### b. Employee Reimbursement Obligations

12. The Debtors also customarily reimburse their Employees for a variety of ordinary, necessary, and reasonable business-related expenses incurred as part of their official duties and in furtherance of the Debtors' business. These include expenses for business travel (including airfare, lodging, taxi costs, automobile rentals, meals, and internet charges), and other general business-related expenses. Employees are expected to use sound judgment and good business sense when incurring the expenses, and in order to be reimbursed, an Employee must submit his or her receipts through the Debtors' expense reporting software program and such expenses must be approved by the Employee's supervisor or manager.

13. During the twelve months prior to the Petition Date, the monthly amount of business-related expenses incurred by the Employees was, on average, approximately $45,000.00, based on the historical average for the first seven months of this calendar year.[5] The Debtors believe that their total prepetition obligations owed in respect of reimbursement of business-related expenses described above will not exceed $6,100.00 as of the Petition Date.

### c. Employee Benefits Obligations

14. Prior to the Petition Date, the Debtors offered eligible Employees[6] and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) medical insurance, (b) dental insurance, (c) vision insurance (d) basic term life and accidental

---

[5] Although the Debtors believe the historical average provided is accurate, the business-related expenses vary greatly from month to month based on the then-active projects and travel needs of Employees.

[6] All Full Time Employees are eligible for Employee Benefits. New hires are eligible to receive Employee Benefits, with the exception of the Retirement Savings Plan, starting on the first day of the month following the date of hire, unless the date of hire is the first day of the month, in which case new hires are eligible to receive Employee Benefits starting immediately. New hires are eligible to participate in the Retirement Savings Plan starting on the first day of the calendar quarter following 90 days after the date of hire (i.e. a new hire with hire date of October 15, 2018 would have the 90 day service period run on January 15, 2019 and would be eligible to participate April 1, 2019).

death and dismemberment insurance, (e) long-term and short-term disability insurance, (f) savings and related types of benefits, (g) workers' compensation, (h) severance benefits, and (i) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the "**Employee Benefits**").  As of the Petition Date, the Debtors were obligated to pay certain contributions to or provide benefits under such plans, programs, and policies.

15.     The Debtors estimate that as of the Petition Date approximately $55,000.00 is outstanding on account of the Health Care Benefits Plans.  As of the Petition Date, the Debtors estimate that they are holding FSA deductions to be remitted to TASC of approximately $2,700.00.  As of the Petition Date, the Debtors estimate that they owe approximately $8,100.00 to Lincoln Financial Group on account of Basic Life, Basic AD&D, STD and LTD insurance premiums, and approximately $14,000.00 has been deducted from Employees' paychecks but not yet transferred to Lincoln Financial Group on account of Voluntary Life and Voluntary AD&D insurance premiums.  Finally, the Debtors estimate that approximately $128,000.00[7] in matching and safe harbor contributions by the Debtors are outstanding as of the Petition Date on account of the Retirement Savings Plan.

16.     I believe that the relief requested in the Employee Wages Motion is necessary for the Debtors' business to continue to operate in the ordinary course of business to maximize value for all stakeholders.  The Employees are vital to the success of these Chapter 11 Cases.  Any delay or failure to pay Employee wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and

---

[7] The Debtors are not required to fund the matching and safe harbor contributions contemporaneously with each payroll but instead are required to fund the matching and safe harbor contributions in accordance with the provisions of the Retirement Savings Plan. Of the total estimated $128,000.00 outstanding, the Debtors are required to fund approximately $15,000.00 by September 30, 2019 and $45,000.00 by December 31, 2019 on account of matching contributions. The Debtors are required to fund the remaining approximately $68,000.00 by March 31, 2020.

would adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to these Chapter 11 Cases and to the Debtors' restructuring efforts. At this early stage, I believe that the Debtors simply cannot risk the substantial damage to their business that would inevitably result from a rapid decline in their Employees' morale.

17. Absent the relief requested in the Employee Wages Motion, I believe that the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable the Employees to meet their own personal financial obligations. Likewise, any interruption to the Employee Benefits provided by the Debtors could have a material, negative effect on the well-being and morale of the Debtors' employees and their families. Without the relief requested in the Employee Wages Motion, I believe that the stability of the Debtors' businesses will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal and valuable Employees will seek other employment options. In addition, to the extent the Debtors owe Employees for business expenses incurred prepetition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors, with the understanding that they would be reimbursed. Further, Employees could become concerned about personal liability for business charges, which could distract them from devoting attention to the Debtors' business. Accordingly, on behalf of the Debtors, I respectfully request that the Employee Wages Motion be approved.

    C. *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests* (the "**Utilities Motion**") [Docket No. 7]

18. Through the Utilities Motion, the Debtors seek entry of an order (i) approving the Debtors' Proposed Adequate Assurance of payment; (ii) prohibiting Utility

Companies from altering, refusing, or discontinuing services; (iii) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests; and (iv) granting related relief.

19. In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, telecommunications, cable, internet, water, waste management (including sewer and trash), gas, and other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Companies**").

20. Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these Chapter 11 Cases. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage these Chapter 11 Cases. It is essential that the Utility Services continue uninterrupted.

21. To the best of my knowledge, there are no defaults or arrearages with respect to the Debtors' undisputed invoices for prepetition Utility Services. On average, the Debtors pay approximately $10,609.00 each month for third-party Utility Services. To date, the Debtors have not made any prepayments or deposits with respect to any of the Utility Companies. To provide additional assurance of payment to the Utility Companies, the Debtors will deposit $5,304.50 (the "**Adequate Assurance Deposit**") into a segregated account. The Adequate Assurance Deposit represents an amount equal to one half of the Debtors' average monthly cost of Utility Services. The Adequate Assurance Deposit will be deposited into the Adequate Assurance Account for the duration of these Chapter 11 Cases. The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any portion of the Adequate Assurance Deposit to the extent not returned to the Debtors pursuant to the terms set forth in any Order granting the relief requested herein.

22. Uninterrupted service from the Utility Companies remains critical to the Debtors continued business operations and the success of these Chapter 11 Cases. Accordingly, I believe that it is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases, and I respectfully submit that the Utilities Motion should be approved.

> D. *Debtors' Emergency Motion for Entry of an Order Authorizing the (I) Payment of Prepetition Insurance Obligations, (II) Maintenance of Postpetition Insurance Coverage, and (III) Maintenance of Postpetition Financing of Insurance Premiums* (the "**Insurance Motion**") [Docket No. 8]

23. Through the Insurance Motion, the Debtors seek entry of an order (i) authorizing the Debtors to (a) continue and renew their Insurance Policies or obtain replacement or new coverage; (b) pay all undisputed premiums, fees, including any fees due to the Debtors' insurance broker, R-T Specialty, LLC (in such capacity, the "**Broker**"), and other obligations relating to the Insurance Policies whether arising prepetition or postpetition (collectively, the "**Insurance Obligations**"); and (c) liquidate in an appropriate forum or settle such Insurance Obligations as necessary; (ii) authorizing the Debtors to maintain or renew premium finance agreements and/or enter into new postpetition financing; (iii) authorizing all banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereto; and (iv) granting related relief.

24. In the ordinary course of the Debtors' businesses, the Debtors maintain or are covered entities under certain insurance policies that are administered by multiple third-party insurance carriers (the "**Insurance Carriers**"), that provide coverage for, among other things: commercial liability, professional liability, directors and officers liability, automobile liability, workers' compensation liability, cyber liability, crime liability, and environmental liability (collectively, as such policies may be supplemented, amended, extended, renewed or replaced, the

"**Insurance Policies**").⁸  I believe that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry and that they are integral to the Debtors' business operations.  The Insurance Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and, in some cases, are required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.

25.     Insurance premiums under the Insurance Policies, and certain fees and taxes associated therewith, are financed through two premium financing agreements and paid on an annual basis in advance of each policy's effective period.  As a result, because the Insurance Policies are paid in advance (through the financing arrangements), there are no outstanding prepetition obligations relating to premiums for the Insurance Policies.

26.     I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Insurance Policies on an uninterrupted basis.  To continue their business operations, the Debtors must maintain appropriate insurance coverage.  Accordingly, I respectfully submit that the Insurance Motion should be approved.

> E. *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Continue to (I) Operate Their Cash Management System, (II) Use Existing Checks and Business Forms and (III) Maintain Existing Bank Accounts; and for Related Relief* (the "**Cash Management Motion**") [Docket No. 9]

27.     Through the Cash Management Motion, the Debtors seek entry of an order (i) authorizing but not directing the Debtors to maintain and use their existing cash management system; (ii) authorizing but not directing the Debtors to continue using their existing bank accounts, checks, and business forms; authorizing and directing all banks with which the Debtors

---

⁸ BTS Enterprises, Inc. ("**BTS**"), a non-debtor affiliate of the Debtors, is the named insured on the directors and officers liability policy and crime policy, each administered through Navigators Insurance Company, as well as the cyber policy administered through Hudson Excess Insurance Company.  The Debtors are named insureds under these policies and the policies are maintained primarily for the benefit of the Debtors.  The Debtors, through one of premium finance agreements (the BTS PFA, as defined herein), pay the premiums for these insurance policies.

maintain accounts to continue to maintain, service, and administer such accounts and to prepare and issue checks on behalf of the Debtors; and granting related relief.

28.     The Debtors use the Cash Management System in the ordinary course of business. The Debtors' Cash Management System is managed by the Debtors' management at their headquarters in Tyler, Texas. Under the Cash Management System, the Debtors maintain and execute, among other things, the following cash management related services: (a) maintenance of their books and records, (b) accounts payable and accounts receivable functions, (c) collection, disbursement, and movement of cash to and from the Bank Accounts (as defined below), (d) administering payroll (e) budgeting, (f) handling customary transactional matters with third parties, and (g) administration and management of all other finance and treasury matters.

29.     As of the Petition Date, the Cash Management System is comprised of a total of nine bank accounts (collectively, the **Bank Accounts**"), six of which are held at Texas Capital Bank, one of which is held at Texas National Bank and the remaining two of which (held at Woodforest National Bank and American State Bank) are presently inactive accounts.

30.     A summary of the Bank Accounts is included in the chart below:

| Account Name[9] | Debtor Account Holder | Account Description |
|---|---|---|
| **Main Operating Account** **TCB - 1115** | KP Engineering, LP | The TCB Operating Account serves as the main operating account and centralized cash management for the Debtors. Funds from the Main Operating Account are used to: (a) fund the Payroll Account and Health Management Account, (b) make payments to vendors of KP Engineering LP, and (c) facilitate payment of all other payables of the Debtors. Payments from the Main Operating Account are made through various funds-transfer mechanisms, including checks, wire transfers and ACH payments. |

---

[9] Only the last four digits of each account number are used to identify each account.

| Account Name[9] | Debtor Account Holder | Account Description |
|---|---|---|
| **Payroll Account**<br><br>TCB – 1107 | KP Engineering, LP | The Payroll Account is used to process employee payroll on a bi-weekly basis to the Debtors' employees.<br><br>The Payroll Account is funded on an as-needed basis every two weeks from the Main Operating Account in an amount sufficient to cover such payroll ACH payments. |
| **FSA Account**<br><br>TCB – 1099 | KP Engineering, LP | The FSA Account is used to process amounts in connection with employees' FSA accounts, which accounts are described in detail in the Debtors' Employee Wages Motion.[10]<br><br>The FSA Account is employee funded. |
| **Health Management Account**<br><br>TCB – 9944 | KP Engineering, LP | The Health Management Account is debited by the health care third-party administrator (UMR) to pay on self-insured health insurance policies, which policies are described in detail in the Debtors' Employee Wages Motion<br><br>The Health Management Account is funded on an as-needed basis from the Main Operating Account. |
| **Facility Account**<br><br>TCB – 9737 | KP Engineering, LP | This account is presently inactive and has a $0 balance. |
| **TNB Operating Account**<br><br>TNB – 2871 | KP Engineering, LP | The TNB Operating Account served as the main operating account prior to the Debtors opening accounts with TCB.<br><br>Presently, the TNB Operating Account receives occasional credits from payments under existing client contracts. These credits are then swept to the Main Operating Account. |
| **Woodforest Operating Account**<br><br>WNB – 7392 | KP Engineering, LP | This account is presently less active account and the Debtors do not routinely transact through this account. |
| **American State Bank Account**<br><br>ASB – 8001 | KP Engineering, LP | This account is presently less active account and the Debtors do not routinely transact through this account. |

---

[10] The "**Employee Wages Motion**" is the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Expense Reimbursements, Benefits, and Related Obligations, (II) Confirming Right to Continue Workforce Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Confirming the Debtors' Authority to Transmit Payroll Deductions, and (V) Authorizing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments.*

| Account Name[9] | Debtor Account Holder | Account Description |
|---|---|---|
| **Utilities Escrow Account** ___ – ___ [11] | KP Engineering, LP | The Utilities Escrow Account was established prior to the Petition Date, and will hold cash for the purpose of providing adequate assurance of payment to the Debtors' utility providers pursuant to the Bankruptcy Code. This account is necessary to ensure that services to the Debtors by such utility providers are not interrupted by these Chapter 11 Cases and will be funded by the Main Operating Account. |

31. Each of the Bank Accounts is insured by the Federal Deposit Insurance Corporation (the "**FDIC**") and, therefore, complies with section 345(b) of the Bankruptcy Code.

32. Requiring the Debtors to adopt a new cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. Importantly, the Cash Management System provides the Debtors with the ability to instantaneously track and report the location and amounts of funds, which in turn allows management to track and control such funds, ensure cash availability, and reduce administrative costs though a centralized cash management structure. Further, current customers make payment directly into certain of the Bank Accounts. Requiring the Debtors to establish new bank accounts could result in delayed cash receipts from customers and create an unnecessary administrative burden on the Debtors efforts to collect cash receipts. I believe that any disruption to the Cash Management System could have a negative impact on the Debtors' restructuring efforts. Indeed, I believe that requiring the Debtors to adopt a new cash management system would needlessly reduce the value of the Debtors' business enterprise and hamstring the Debtors efforts to collect timely on current and future customer contracts at a time when cash is critical. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into

---

[11] The Debtors intend to setup a new debtor-in-possession account at TCB for the Utilities Escrow Account.

chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities rather than distracting such employees by introducing a new cash management system.

33. Accordingly, I believe that the relief requested in the Cash Management Motion is essential to the Debtors' business operations, and that denial of such relief would disrupt the Debtor's ongoing business. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, its creditors, and all other parties in interests, and will enable the Debtors to continue to operate their businesses during the pendency of these Chapter 11 Cases. I respectfully submit that the Cash Management Motion should be approved.

> F. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Financing on a Secured, Superpriority Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**DIP Motion**") [Docket No. 10]

34. Through the DIP Motion, the Debtors' seek (a) approval of the DIP Facility and the loans thereunder, (b) authority to use the Prepetition Lender's cash collateral ("**Cash Collateral**"), and (c) the grant of adequate protection for the benefit of the Prepetition Lender, all for the primary purpose of providing the Debtors with sufficient postpetition liquidity to finance these Chapter 11 Cases.

35. Faced with insufficient cash and liquidity to effectuate the restructuring efforts sought through these Chapter 11 Cases, the Debtors engaged in discussions and negotiations regarding the terms of potential financing. Following extensive, good faith, and arm's-length negotiations with the Prepetition Lender and DIP Lender, the Debtors ultimately agreed to the terms of a $4 million superpriority, priming, secured DIP facility (the "**DIP Facility**")

with BTS Enterprises, Inc. (the "**DIP Lender**"). The DIP Note also allows for the Debtors consensual use of cash collateral during these Chapter 11 Cases. The Prepetition Lender is providing the funds for the DIP Facility to the DIP Lender and will be the assignee of the DIP Facility.

36. The proposed DIP Facility provides $4,000,000.00 of new money, $750,000.00 on an interim basis and an additional $3,250,000.00 after entry of the Final Order. The terms of the DIP facility are reasonable and within the range of market terms. The DIP Facility will bear interest at two percent (2%) per annum plus, effectively, at the higher of: (a) the Prime Rate for such day; (b) the sum of the Federal Funds Rate for each day plus ½ of one percent (0.5%); and (c) LIBOR for such day. Interest on the DIP Facility will be payable on a quarterly basis, with no principal to be repaid until maturity. Maturity is at the earlier of the effective date of a plan of reorganization or August 15, 2020.

37. The Debtors considered alternative options to finance its operations including requests to the Prepetition Lender to use cash collateral. At the conclusion of the process and following extensive discussions and negotiations with the Prepetition Lender and, eventually, the DIP Lender, the Debtors concluded, in consultations with its advisors, that the DIP Facility represents the best postpetition financing alternative available to the Debtors under the circumstances and that alternative sources of financing with overall terms as favorable as those of the DIP Facility are not available to the Debtors. As a subsequent market check on the terms, we received an inquiry shortly after the filing of the petitions from a third party lender who advised that it would not meet or beat the terms of the DIP Facility.

38. The Debtors require immediate access to the DIP Facility in addition to continued use of the Prepetition Lender's cash collateral. As of the Petition Date, the Debtors'

total unrestricted cash balance is approximately $10,000.00, which is insufficient to operate their enterprise and continue paying their debts as they come due.  During these Chapter 11 Cases, the Debtors will need access to the DIP Facility to help satisfy payroll, pay dealers, suppliers, and subcontractors, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these cases.  As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their business, preserve value, and avoid irreparable harm.

39. The Debtors also require immediate access to the DIP Facility and continued use of Cash Collateral in order to finance the fees, costs and expenses associated with these Chapter 11 Cases.  The proposed DIP Financing and use of Cash Collateral are vital to providing the Debtors the runway necessary to successfully consummate their restructuring strategy.

40. Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course of business or to preserve or maximize the value of their assets for the benefit of all creditors and parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.